IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 1:CR-01-018 |
| | ) | |
| v. | ) | |
| | ) | (Judge Rambo) |
| GEOVANI DAVILA, | ) | |
| | ) | |
| Defendant. | ) | (ELECTRONICALLY FILED) |


**BRIEF OF UNITED STATES IN OPPOSITION TO PETITIONER'S
MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE
BY A PERSON IN FEDERAL CUSTODY**


Thomas A. Marino
UNITED STATES ATTORNEY

Gordon A.D. Zubrod
ASSISTANT U.S. ATTORNEY

# TABLE OF CONTENTS

**PAGE**

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    ARGUMENT ONE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    ARGUMENT TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    ARGUMENT THREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    ARGUMENT FOUR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    ARGUMENT FIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    ARGUMENT SIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    ARGUMENT SEVEN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    ARGUMENT EIGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    ARGUMENT NINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE

## PROCEDURAL HISTORY

On January 17, 2001, a Federal Grand Jury sitting in Harrisburg, Pennsylvania returned a One-Count Indictment against Davila, charging him with conspiracy to distribute and to possess with intent to distribute heroin, with death resulting.

On or about January 29, 2001, Davila was arrested in Philadelphia at his residence at 5th & Dauphin Streets.  On January 30, 2001, Davila appeared before the Magistrate Judge, entered a plea of not guilty and was ordered detained temporarily.  On February 2, 2001, a detention hearing was held and Davila was ordered detained pending trial.

On June 20, 2001, Davila appeared before the District Court and entered a plea of guilty to the Indictment.

On February 8, 2002, Davila was sentenced to 384 months imprisonment, 5 years supervised release, restitution in the amount of $11,209.66 and a special assessment of $100.00.

On February 11, 2002, Davila filed a Notice of Appeal to the Third Circuit Court of Appeals.   Davila's appellate brief contended that the District Court failed to establish a legally sufficient factual basis for the existence of a conspiracy and for his role in that conspiracy.  On March 27, 2003, Davila's claim was summarily rejected by the Third Circuit in a written opinion, finding that the District Court

had explained the conspiracy charge to Davila and that the prosecutor had set forth

facts which supported the charge of conspiracy to distribute heroin resulting in

death.  More to the point, Davila had clearly communicated to the District Court

his understanding of the law of conspiracy and had admitted to each element of the

offense see Statement of Facts.

On June 18, 2003, Davila filed a Petition for Writ of Certiorari to the United

States Court of Appeals for the Third Circuit.  The Petition was denied by the U.S.

Supreme Court on October 20, 2003.

On September 15, 2004, Davila filed a Motion to Vacate, Set Aside or

Correct Sentence by a Person in Federal Custody pursuant to 28 U.S.C. §2255.

On November 23, 2004, the District Court dismissed the Motion without prejudice

to refile at the appropriate time.

On July 18, 2005, Davila filed a Motion to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody pursuant to 28 U.S.C. §2255.  On August

16, 2005, the District Court directed the U.S. Attorney's Office to respond to the

Motion.

## STATEMENT OF FACTS

Giovanni Davila was a drug trafficker living in the "Bad Lands" of North

Philadelphia, the place where he was arrested.  He sold cocaine and heroin from

his apartment at 5th and Dauphin Streets in Philadelphia. A significant percentage of his heroin trafficking involved distributions to teenagers and young adults from Mifflin County, Pennsylvania; specifically, from Lewistown, Pennsylvania and its surrounding communities. Numerous individuals would have testified that a) they had traveled on a regular basis to meet with Davila in Philadelphia, b) Davila was the primary source of supply for heroin to the Mifflin County drug users, c) they had pooled funds to acquire heroin from Davila and would travel together to and from Philadelphia to meet with Davila. Further, witnesses would have testified that Davila had discussed Lewistown as one of his key heroin outlets and of the profits he made selling heroin acquired in Philadelphia in Lewistown. Davila used his house for protection and security for the drug users, given the hostile environment in the "Bad Lands." Davila also made telephone calls to the Lewistown area to speak to his customers on a regular basis and they also called him. The heroin distributed by Davila was stamped "357" and "Bedtime."

On November 24, 2000, four Lewistown-area drug users, Joshua Woods, Ariel Bohn, Aaron Bohn (brother of Ariel), and Chad Amspacker were out of heroin and beginning to get sick (i.e., they began to go through withdrawal pangs). They pooled their funds and together drove to Philadelphia to acquire heroin from

Davila. Upon arriving in Philadelphia, they paged Davila, who met them at his apartment and supplied them with heroin.

Josh Woods and Ariel Bohn immediately injected heroin into their system and continued to do so on the return trip to Lewistown. They arrived in Lewistown at approximately 11:30 p.m. on November 24, 2000. Josh Woods and his girlfriend, Ariel Bohn, went to Woods' grandmother's house (Betty Eckley in Armagh Township) where they spoke briefly with Mrs. Eckley and went to bed.

When Josh Woods and Ariel Bohn had not emerged from the bedroom by late afternoon of November 25, 2000, Mrs. Eckley checked in on them and found Josh Woods dead and Ariel Bohn unconscious. Ariel Bohn was rushed to a hospital were she lay in a coma for five days.

The autopsy of Josh Woods and the toxicological examination of Woods' and Ariel Bohn's blood samples determined that both had suffered from an overdose of heroin. In fact, to this day, Ariel retains some mental impairment as a result of the heroin overdose. Both had lethal levels of heroin in their blood system.

When Davila was arrested he had in his possession heroin, cocaine, a firearm and approximately $1,000 in cash in his pants pocket.

The Indictment charged Davila with a single count of conspiracy to distribute and to possess with intent to distribute heroin in violation of 21 U.S.C. §846.  The count read as follows:

> 1. Beginning on or about dates unknown to the Grand Jury and continuing up through on or about December, 2000, in Mifflin County, within the Middle District of Pennsylvania, and elsewhere the defendant **JOHN DOE, a/k/a  "GIOVANNI", a/k/a "JOVANTE",** along with individuals known and unknown to the Grand Jury, knowingly and intentionally combined, conspired, confederated and agreed together to knowingly and intentionally distribute, and possess with intent to distribute, heroin, a Schedule I controlled substance.

> 2. In furtherance of this conspiracy and to attain the objects thereof the defendant and his co-conspirators engaged in, and aided and abetted in, numerous distributions of heroin including a distribution of heroin on or about November 24, 2000, which distribution resulted in the death of an individual in Mifflin County Pennsylvania as a result of the use of the heroin.

> All in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(C).

At Davila's change of plea hearing on June 20, 2001, undersigned counsel presented the following facts to the District Court.  The summary is restated in its entirety:

MR. ZUBROD:     There are essentially two prongs to this charge, Your Honor: First, the issue of whether there was a conspiracy and, secondly, the issue of whether that conspiracy resulted in the death of another individual.

Regarding the issue of conspiracy, over one dozen individuals would have appeared to testify against Mr. Davila, and they would have stated that they are residents of the Lewistown area, that there was a general agreement among the Mifflin County heroin users to use Mr. Davila as their heroin source of supply.

They pooled their funds to acquire heroin from Mr. Davila. They would jointly travel down to and from Philadelphia to acquire heroin from him.

Trusted individuals, individuals trusted by Mr. Davila, would make introductions of new heroin customers to him. There were telephone calls used to set up the heroin purchases.

If the Court would direct its attention over to the two charts, you will note that these are calls from a heroin user in Lewistown, Pennsylvania to Mr. Davila. This heroin user was trusted by Mr. Davila. She introduced numerous individuals to him. And you will note, for example, on November 21, 2001, at 10:25 P.M., she placed a call to Davila's pager from her cell phone.

THE COURT:        What was that date again.

MR. ZUBROD:      This date is November 21.

THE COURT:        Okay.

MR. ZUBROD:      The year 2000 at 10:25 P.M.

THE COURT:        Right.

MR. ZUBROD:      This chart represents calls to Lewistown from Mr. Davila's cell phone that was rented actually in the name of his girlfriend, Justina Rodriguez.

6

On 11/21, two minutes later, at 10:27 P.M. he returned Heather Suloff's page calling her number. Another example is November 22, 2001 at 8:26 A.M. Heather Suloff paged Mr. Davila's phone. On November 22 at 8:31 A.M. approximately 5 minutes later, Mr. Davila placed a return call from his cell phone to Suloff's cell phone.

These phone calls show she would page him, and she would testify that she was paging him regarding customers who were coming down that she was sending who would buy heroin, that she was coming down and so on. And he would return her call within minutes after her having placed it.

We submit that as significant evidence of an agreement for the regular distribution over a period of days and months of heroin between Mr. Davila and other individuals. And other individuals would testify that Ms. Suloff drove them down, introduced them to Mr. Davila.

THE COURT:    She actually drove the customer?

MR. ZUBROD:    Yes, she did. Made the initial introductions. Later, they would go on themselves.

She would testify that Mr. Davila discussed with her and many of these – at least seven of these individuals would have said that they spoke with Mr. Davila about the difference between the profit one made in Philadelphia for the sale of heroin and the profit one could make in Lewistown since heroin was so scarce. And it is about a triple difference. You could get a bundle of heroin for about $10.00 – packets of heroin for $10.00. You could sell them for $30.00 in Lewistown.

Mr. Davila spoke with numerous individuals about coming up on weekends and setting up shop in Lewistown. So it was clear that Mr. Davila was well aware that he was distributing heroin

7

to a group of individuals in Lewistown and that he was their supplier.

They agreed to meet in Mr. Davila's house at 5th and Dauphin – or apartment – for protection and security.

THE COURT:    At where?

MR. ZUBROD:    At the corner of 5th and Dauphin Streets in Philadelphia, Pennsylvania. Mr. Davila would notify his own source of heroin when Lewistown heroin users were coming to town to buy heroin.

Mr. Davila knew that he was supplying a group of addicts from Lewistown. He gave them his pager number. He used his house to distribute. He took steps to acquire heroin from a source. He placed calls to the Lewistown group, and he acted as their facilitator at the very least.

On November 24, 2000, Josh Woods, Ariel Bohn, his girlfriend, Aaron Bohn, the brother of Ariel Bohn, and Chad Amspacker, all of whom lived in the Lewistown area, and all of whom were heavy heroin users, had run out of heroin and were beginning to manifest the signs of withdrawal from not having heroin. They began to get physically ill. They pooled their funds on that date and they traveled, and they traveled to Philadelphia to an area in Philadelphia known as the Bad Lands, a place notorious for heroin trafficking.

They did it to get heroin from the man that they new as Giovanni and whom they described as the 6 fingered man. They arrived at the defendant's apartment at 5th and Dauphin Streets were they met with the defendant.

He contacted his supplier. The supplier, a Hispanic speaking gentleman who did not speak English, arrived, gave the heroin to the defendant who distributed it to the four in exchange for

8

cash.  Joshua Woods and Ariel Bohn immediately injected the heroin.  The type of heroin they received was "357."  It was called – it was stamped "357".  They arrived back home in Lewistown late on the evening of November 24.  Josh Woods and Ariel Bohn went to Josh's grandmother's home in Armangh Township in Mifflin County to spend the night.  They spoke with his grandmother in the early morning hours of November 25, 2000.  She is present in Court today.  And then they went to bed.

The next day when Josh's grandmother went in and attempted to waken them she found Josh dead and Ariel Bohn in a coma.  My colleague Steve Snook, who is the District Attorney of Mifflin County and a Special Assistant United States Attorney, will now relate to the Court what the autopsy and toxicology report revealed regarding both Josh Woods and Ariel Bohn.

MR. SNOOK:          Judge, a forensic autopsy was done by the Forensic Pathology Associates in Allentown, Pennsylvania.  The significant finding was that the level of heroin – really morphine - but it was morphine that had metabolized from heroin and Mr. Woods' body was 2 ½ times the level that is generally regarded as capable of producing a fatality.

What really happened to Mr. Woods is that his breathing just slowed down due to his overdose of heroin.  His lungs filled up with fluid, and he expired.

It is clear that the pathologist who did the autopsy believes and opines that the direct cause of death was a heroin overdose.

We have also the pathology looked at by Ward Donovan, who is the forensic toxicologist, which is a little bit more specialized field of endeavor just regarding the toxicology.  He practices at the Hershey Medical Center.  He looked at it.

He looked at both the autopsy report and medical records for Ariel Bohn. Ariel Bohn's medical records showed also a high level of heroin. Mr. Donovan opined that the heroin caused the death of Mr. Woods without any hesitation. And he also believes that heroin caused the comatose state and I guess permanent cognitive of deficits that Ms. Bohn experiences today.

She was in a coma for several days at the Hershey Medical Center and has recovered, but still has some permanent cognitive deficits as a result of it.

MR. ZUBROD:    The evidence would establish that Ariel Bohn and Josh Woods had no heroin, neither did any of the other people in the car when they went to Philadelphia and acquired it from Mr. Davila. Therefore, the heroin that killed them had to have come from him.
The officers who searched the room in which Josh Woods died and Ariel Bohn went into a coma found packets – empty packets of "357", the same packets that had been supplied by Mr. Davila.

That would be the evidence that the government would produce if called upon.

The District Court went through a detailed colloquy regarding the crime of conspiracy with Davila, advising Davila that the Indictment charged that he "knowingly and intentionally conspired and agreed to knowingly and intentionally distribute or possess with intent to distribute heroin, which is a controlled substance and as a result of that distribution, there resulted a death by an overdose of said heroin." The District Court then inquired of Davila, "first of all, do you

10

understand that a conspiracy is an agreement between two or more persons to do an unlawful act, and you don't need a signed or written contract or anything in writing?  It merely means that you mutually agreed by your actions, whether verbal or nonverbal to do certain acts, to due an unlawful act.  In this case, the unlawful act of the distribution of heroin.  Do you understand conspiracy?" Davila responded "yes".

At Davila's sentencing on February 8, 2002, Davila's counsel, speaking on his behalf, stated that "[h]e was a very small cog in this overall operation.  Mr. Davila actually provided a sort of safe harbor for these individuals in Philadelphia in that they would come to his house and be in an area were they could be safe and not be robbed.  Actually, he provided somewhat of a service for these individuals. They would call him, tell him what they wanted.  He would either call the person who was suppose to bring it, and they would bring it to him before they arrived, or the person would bring it when the people from Lewistown arrived."  Davila also addressed the Court stating "...like my lawyer said, the source, it was the other guy.  I was just a small part of it."  Davila further stated "they was just using my place for the distribution.  I wasn't no big guy, no big shot."

11

# **ARGUMENT**

Davila asserts nine (9) reasons why his conviction should be vacated.  These

are:

1.    Davila's plea was entered in violation of his 5th and 6th Amendment
      rights because (a) the decedent's name was not specifically mentioned
      in the Indictment, and (b) the Indictment failed to specify an amount
      of heroin distributed that resulted in the death of the decedent;

2.    Davila's sentence of 384 months imprisonment violated the holding
      in *Blakely v. Washington*, 124 S. Ct. 2531 (2004) in that the sentence
      exceeded the statutory maximum charged;

3.    Counsel was ineffective for failing to investigate the case and
      interview witnesses that would have provided testimony contradicting
      the government's evidence;

4.    The government provided no expert testimony to establish the
      decedent's cause of death;

5.    Davila's 6th Amendment rights were violated by the failure of the
      government to provide him with counsel at his removal hearing in the
      Eastern District of Pennsylvania pursuant to the mandate of *Gideon v.
      Wainright*, 372 U.S. 335 (1963);

6.    The Special Assistant U.S. Attorney, who was also the District
      Attorney for Mifflin County, was without "jurisdiction" to prosecute
      Davila because his appointment as a Special Assistant U.S. Attorney
      had expired during the prosecution of the case;

7.    Davila was sentenced under the U.S. Sentencing Guidelines which, he
      contends, are unconstitutional;

8.    The sentence of restitution was illegal because no investigation was
      made into Davila's ability to pay the amount imposed;

9.    Davila's due process rights were violated because he had a hearing impediment that prevented him from understanding the plea and sentencing hearings.

**ARGUMENT ONE**:

Davila argues that his guilty plea was defective for two reasons:   First, the name of the decedent did not appear in the Indictment.  Second, the Indictment did not identify the amount of heroin distributed that resulted in the death.  In support of his argument, Davila cites *United States v. Rebman*, 321 F.3d 540, 542 (6th Cir. 2003) for the proposition that the "if death results" provision of 21 U.S.C. §841(b)(1)(C) is an element of the offense that must be proven beyond a reasonable doubt, not a sentencing factor to be determined by the sentencing judge.  Davila then cites *Blakely v. Washington*, 124 S. Ct. 2531 (2004), arguing that the statutory maximum had to be "reflected in the charge."  Petitioner's Brief at 5.  Davila's point is that, since the name of the decedent is not mentioned in the Indictment and since no amount of drugs is set forth in the Indictment, his plea was involuntary.

The United States would respond that Davila has confused the issue of the sufficiency of the Indictment with the issue of whether he providently pled to the offense.  Moreover, he has either misread *Blakely* as requiring details in the Indictment beyond the elements of the offense or he has misidentified evidence

13

relating his particular crime as elements of the offense requiring insertion into the Indictment.

Regarding his claim that the names of the victims did not appear in the indictment, Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment need only contain those facts and elements of the alleged offense necessary to inform the accused of the charge so that he or she may prepare a defense and invoke the Double Jeopardy Clause when appropriate. *United States v. Whited*, 311 F.3d 259, 263 (3d Cir. 2002) (Indictment that did not describe the victim in detail was sufficient because the defendant had notice of the nature of the crime charged that was adequate to prepare his defense); *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Whiffen*, 121 F.3d 18, 21-22 (1st Cir. 1997) (Indictment that tracked statutory language sufficient because enough to prepare double jeopardy defense if needed). In the present case, the defendant was placed on notice by the indictment, which identified the precise date of the distribution of the heroin that resulted in the death of a customer from Mifflin County. The discovery process included the name of the decedent, the autopsy and toxicology reports, and the summary of testimony of the medical expert who would have testified at trial that

14

the heroin supplied by the defendant was in fact the cause of death.  There is not a

single case requiring that the victim be named ***as an element of the offense***.

Moreover, a cursory review of the guilty plea and sentencing colloquies

demonstrates that Davila was well aware of the name of the decedent and of his

(Davila's) relationship with the decedent.

Davila also cites as proof of the inadequacy of the Indictment the fact that it

mentions no amount of heroin.  The difficulty with this argument is that, when

death has occurred as the result of the use of the drug, then no amount of the drug

need be proven to trigger the more severe penalty.  21 U.S.C. §841(b)(1)(C), the

penalty section cited in the Indictment, has no requirement regarding a particular

amount of the drug required for a particular sentence.  Instead, the statute provides

that:

> **(C)**    In the case of a controlled substance in Schedule I or II...such person
> shall be sentenced to a term of imprisonment of not more than 20 years and
> if death or serious bodily injury results from the use of such substance shall
> be sentenced to a term of imprisonment of not less than twenty years or
> more than life....

21 U.S.C. §841(b)(1)(C).

Davila's reliance upon *Blakely v. Washington*, 124 S. Ct. 2531 (2004) is

misplaced.  He cites it for the proposition that "the relevant 'statutory maximum'

sentence is not the maximum sentence that a judge may impose after finding

15

additional facts, but the maximum he may impose without any additional findings." Petitioner's Brief at 6. However, *Blakely*, citing *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348 (2000), held that the facts supporting a sentence must be either admitted by a defendant for found by a jury beyond a reasonable doubt . *Blakely*, 124 S. Ct. at 2535. As the guilty plea colloquy makes clear, Davila entered a plea of guilty fully aware of the date of the death, the individuals involved in the lethal transaction, his role in selling the drugs, the amount of drugs. After the recitation of his involvement in the death of Josh Woods and the near-death of Ariel Bond, Davila entered a plea of guilty, thus admitting the "death/serious bodily injury" prong of the statute, foreclosing the necessity for a jury finding and exposing him to an enhanced sentence.

## ARGUMENT TWO

Davila's second argument is a restatement of his first, namely, that his 384-month sentence exceeded the maximum permitted under *Blakely*. This is so, he argues, because (a) the Indictment failed to state an amount, and (b) the Indictment failed to identify the decedent. The United States incorporates by reference its response to the first argument.

**ARGUMENT THREE**

Davila raises the issue of his counsel's ineffectiveness, assigning a series of failures on the part of his counsel that prejudiced his case. These include:

1. Failure to move to dismiss the Indictment based on the arguments set forth in Arguments One and Two, above;

2. Failure to investigate the case and interview witnesses that would have provided alibi testimony contradicting the government's evidence;

3. Failure to require the government to prove that he had actually made the sale that killed the decedent;

4. Failure to "test" the government's autopsy report by looking into the qualifications and certification of the lab, its testing processes and personnel.

Regarding the first ground of ineffectiveness, failure to move to dismiss the Indictment for the reasons set forth in Arguments One and Two, the United States +incorporates its answers in Arguments One and Two into this section. The second ground of ineffectiveness, that is, failure to investigate the case and interview an unnamed witness that would have provided alibi testimony contradicting the government's evidence, Davila's admission of his involvement in the sale of heroin that led to the death of Josh Woods forecloses further inquiry. Having pleaded guilty to the offense, Davila cannot now be heard to argue that he in fact had an alibi for the day in question. A guilty plea waives most non-

17

jurisdictional constitutional rights, including the right to confront one's accusers.

*Boykin v. Alabama*, 395 U.S. 238, 243 (1969).  This is not newly discovered

evidence.  This is evidence that Davila allegedly had in his possession at the time

that he entered his plea of guilty.  In fact, he acknowledged during his guilty plea

colloquy that he had in fact been the supplier of the decedent.  He admitted to the

very detailed presentation of evidence linking him to the November 24, 2000

distribution of heroin that killed the decedent.    Moreover, his alibi claim is

refuted by trial counsel.  Davila's "alibi" defense rested on the fact that he often

stayed at his mother's house, not just at the 5th and Dauphin residence.  See

Attachment A.

Davila cites the case of *Kubat v. Thieret*, 867 F.2d 351 (7th Cir. 1989) in

support of his second claim.  In *Kubat*, the defendant was convicted of aggravated

kidnaping and murder and was sentenced to death.  He challenged his conviction

on three grounds: (1) unreliable identification testimony, (2) ineffectiveness of

counsel, and (3) failure to instruct on a lesser included offense.  Id at 356.  The

Illinois Supreme Court affirmed, but the U.S. District Court for the Northern

District of Illinois granted the *habeas corpus* petition in part, holding that the trial

court gave erroneous jury instructions regarding the requirement of unanimity in

imposing the death penalty.  Id at 373-74.  The District Court rejected Kubat's

18

allegation that his attorney was ineffective for failure to call alibi witnesses. The 7th Circuit affirmed, noting the trial strategy employed by counsel did not render him ineffective.

It is difficult to discern how *Kubat* supports Davila in his claim of ineffective assistance of counsel. *Kubat* involved a trial where the defendant was entitled to call witnesses on his behalf and confront the government's witnesses. Davila's case involved a guilty plea where those rights were waived. Davila, in his present brief, does not suggest that he was innocent. He apparently is maintaining that the injection of the unidentified "alibi" witnesses might have raised a reasonable doubt in the minds of the jurors had he gone to trial. Unfortunately, Davila pleaded guilty to having caused the death of another by supplying him with heroin on the date alleged. In fact, Davila's direct appeal raised only one issue: Whether, at Davila's change of plea hearing, a legally sufficient factual basis had been established regarding the existence of a conspiracy and Davila's role in it. The fact that he failed to raise a claim of alibi at any time during his prosecution and on direct appeal is powerful evidence that such a claim didn't exist, a conclusion supported by his attorney's affidavit. See Attachment A. Davila's claim is foreclosed by his plea of guilty.

19

Davila's third allegation of ineffective assistance of counsel can only be addressed by using the precise language used by Davila: "Petitioner contend [sic] that the alleged charge accused him of selling heroin that caused overdose death and not 'an intent' to do so."  Presumably, his argument is that the Indictment charged him with causing the death of the decedent by selling heroin and ***failed*** to charge him with doing so intentionally.  Petitioner's Brief at 10.  However, he then cites *Bailey v. United States*, 516 U.S. 137, 116 S. Ct. 501 (1995) in support of his position by saying "...the court held that 'actual' use is required to convict as in here 'actual sales is also required to convict and not and 'intent.'" That is the sum and substance of his argument.  It appears, then, that Davila is arguing that he didn't sell the heroin that killed Josh Woods.  These type of factual issues, however, were waived when he entered a plea of guilty admitting that he had in fact supplied the heroin that killed the decedent.  *Boykin v. Alabama*, 395 U.S. at 243*; McCarthy v. United States*, 394 U.S. 459, 466 (1969); *Herrada v. City of Detroit*, 275 F.3d 553, 559 ( 6th Cir. 2001) (guilty plea is a waiver of the constitutional rights against self-incrimination, to trial by jury, and to confront one's accusers).  *Bailey* is of no assistance to the defendant in his claim, since it involved a jury trial where the amount of evidence presented by the prosecution was found wanting as a matter of law.  This type of evidence weighing was

foreclosed by Davila admitting in his guilty plea to having caused the death of the decedent when he (Davila) supplied the decedent with the heroin from which he overdosed.

Davila's final allegation of ineffectiveness rests in the failure to test the autopsy report by challenging the qualifications of the personnel and of the "laboratory" where the autopsy had been performed.  Even assuming *arguendo* that this "failure" (to challenge the qualifications of a board certified pathologist and toxicologist) constitutes error, it is one that was waived by the entry of the guilty plea, since it is non-jurisdictional in nature.  *Tollettt v. Henderson*, 411 U.S. 258, 267 (1973); *Hooper v. United States*, 112 F.3d 83, 86 (2nd Cir. 1997) (guilty plea waives challenges except those that could be properly termed jurisdictional). The qualifications of an expert goes to the weight of their testimony.

In essence, Davila's grievance with his attorney revolves around Davila's decision (at, presumably, his attorney's recommendation) to plead guilty to the offense.  His present attempt to retroactively find misfeasance in his attorney's representation of him is precisely the kind of litigation foreclosed by the Supreme Court in *Strickland v. Washington* 466 U.S. 668, 687 (1984), which established a two-pronged test to evaluate ineffective assistance claims.  To obtain a new trial, a defendant must prove:   (1) that counsel's performance fell below an objective

standard of reasonableness, and (2) that counsel's deficient performance

prejudiced the defendant, resulting in an unreliable or fundamentally unfair

outcome in the proceeding.  466 U.S. at 687.  A defendant's failure to satisfy one

prong of the *Strickland* test negates a court's need to consider the other.  466 U.S.

at 697.

       In deciding whether a counsel's performance was ineffective, a court must

consider the totality of the circumstances.  466 U.S. at 690.[1]  Nonetheless, the

defendant must point to actual ineffectiveness, either through specific errors or

omissions of counsel, and may not rely solely on the surrounding circumstances to

prove ineffective assistance.  *United States v. Cronic*, 466 U.S. 648, 665 (1984).

       Under the performance prong of  *Strickland*, there is a "strong presumption"

that counsel's strategy and tactics fall "within the wide range of reasonable

professional assistance.  *Strickland*, 466 U.S. at 668, 689.  That presumption

should adhere to counsel in the present case, who competently represented a

defendant facing the testimony of over a dozen eyewitnesses and co-conspirators

to his involvement in the heroin distribution conspiracy and in the death of Josh

---

[1]The court must "determine whether, in light of all the circumstances, the identified acts
or omissions were outside the wide range of reasonable professional judgment."

Woods and whose client admitted his guilt before the District Court. Davila's

claim of ineffective assistance of counsel is without merit.

## ARGUMENT FOUR

Davila's fourth argument falls into the previous category:    The government

provided no expert testimony to establish the decedent's cause of death. As the

record of the guilty plea makes clear, the prosecution went through a detailed

summary of the autopsy and toxicology report. Further, Davila's claim must fail,

since he waived precisely such inquiries by reason of his guilty plea. *Hooper* at

86.

## ARGUMENT FIVE

Davila's fifth argument maintains that his 6th Amendment rights were

violated by the failure of the government to provide him with counsel at his

removal hearing in the Eastern District of Pennsylvania pursuant to the mandate of

*Gideon v. Wainright*, 372 U.S. 335 (1963). Had he been provided counsel, Davila

maintains, he would have challenged the indictment (pending against him in the

Middle District of Pennsylvania) at his identity/removal hearing in the Eastern

District of Pennsylvania. Davila maintains that he has no recollection of whether

or not he was represented by counsel at his removal hearing in the Eastern District

of Pennsylvania.  Davila maintains his innocence, calling himself the "fall guy."

Petitioner's Brief at 13.

Since Davila initially pleaded guilty and acknowledged that he had supplied

the heroin that had led to the decedent's death, his present assertion that he is

innocent must have been arrived at after his sentence (and direct appeal, since he

didn't mention the possibility of his innocence at that juncture either).  Davila's

failure to litigate this issue when he appeared before the U.S. District Court in the

Middle District of Pennsylvania renders his claim that he would have done so at

his removal hearing in the Eastern District of Pennsylvania not worthy of serious

consideration.

In any case, Davila's claim that he wasn't represented by counsel is false.

The records of his removal hearing reveal that he was represented by Michael J.

Kelly, Esquire.  The records further reveal that Davila, after having consulted with

his counsel, waived an identity hearing, acknowledged that he had no right to a

preliminary hearing and agreed to his removal to the charging district.  See

Attachment B.

As to Davila's legal argument, the case of *Gideon v. Wainright*, 372 U.S.

335 (1963) is of no assistance to him.  *Gideon* involved an indigent defendant who

asked for but was denied an attorney to represent him at trial.  The Supreme Court

24

ruled that the Sixth Amendment included the right to the assistance of counsel at trial. Subsequent rulings extended this right to counsel during "critical stages" of the pretrial proceedings. *United States v. Wade*, 388 U.S. 218, 224 (1967).

Nothing substantive occurred at his removal hearing in the Eastern District of Pennsylvania. Indeed, a removal proceeding under Federal Rule of Criminal Procedure 5(c)(3) for a defendant under indictment in another district is fairly perfunctory. The magistrate judge must transfer the defendant to the charging district if (a) the government produces a certified copy of the warrant, and (b) the judge finds that the defendant was the same person named in the indictment. FRCrP 5(c)(3)(D)(I) and (ii).

In other words, the removal hearing was not constructed to accomplish the purpose which Davila now seeks to ascribe to it: Litigating the facts of the Indictment. It appears that he followed the advice of his counsel, waived an identity hearing, and agreed to his removal to the Middle District of Pennsylvania. The trial was the venue in which the facts of the Indictment would have been litigated, had Davila not admitted that he was guilty prior to the trial.

## ARGUMENT SIX

Davila complains that Steve Snook, the Special Assistant U.S. Attorney who assisted the undersigned Assistant U.S. Attorney in the prosecution, was

"without jurisdiction" to prosecute him. This is so, Davila argues, because Mr. Snook's appointment of Special Assistant U.S. Attorney had expired during the prosecution of the case. Without going into the law relating to appointments of Special Assistants, the short answer to Davila's claim is that it is false. Davila was indicted on January 17, 2001 and was sentenced on February 2, 2002. Steve Snook, the District Attorney for Mifflin County, Pennsylvania, was appointed in June of 1999 and, except for a brief period in 1999, received extensions on his appointment through 2003. See Attachment C. In any case, the lead prosecutor in the case was the undersigned counsel, who handled every aspect of the case. Thus, even if Davila's assertion regarding Mr. Snook were true, the issue would be moot because an Assistant U.S. Attorney handled the entire case (Mr. Snook was the "second chair"). Davila's argument is utterly without merit.

## ARGUMENT SEVEN

Davila's next objection to the proceedings was that he was sentenced under the U.S. Sentencing Guidelines which, he contends, are unconstitutional. Davila was facing 360 months to life under the U.S. Sentencing Guidelines. The District Court sentenced him to 384 months imprisonment.

Davila argues that the ruling in *United States v. Booker*, 125 S. Ct. 738 (2005) mandates that his case should be remanded because the facts relating to his

guilt were not found by a jury beyond a reasonable doubt.  He then incorporates his earlier arguments in support of this Motion.  Likewise, the United States incorporates its responses in Arguments One and Two as though fully set forth herein.

The United States would further respond that, consistent with the Supreme Court's holding in *Booker*, the District Court treated the Sentencing Guidelines as advisory and awarded a sentence in excess of the minimum Guideline range based upon the individual characteristics of the defendant.

*Booker* held that it was the mandatory nature of the Guidelines which led to a Sixth Amendment violation, and that, by excising the two sections which made the Guidelines mandatory, it remained permissible for the district courts to calculate the Guideline range based on facts found by the judge by a preponderance of the evidence.  125 S. Ct. at 745-69.  Thus, Davila is arguing that the District Court violated a Supreme Court ruling that the Sentencing Guidelines are discretionary by sentencing him in a discretionary manner.  It is that exercise of discretion that Davila has declared unreasonable.

*Booker*, citing 18 U.S.C. § 3553(a)(4), requires that the District Court take the Guidelines into account when sentencing a defendant and for the Court of Appeals to review sentencing decisions for unreasonableness. 125 S. Ct. at 745.  A

27

review of the colloquy of the sentencing hearing demonstrates that the District Court did in fact take the Guidelines into account in fashioning an individualized sentence for Davila.

Davila contends that the District Court's decision was unconstitutional under *Booker* (and, presumably, under 18 U.S.C. § 3553(a)). However, Davila does not identify which factors under Section 3553(a)(1) the District Court failed to take into account. From a review of the transcript and of the Presentence Investigation Report, however, it is apparent that the District Court very carefully and individually considered Davila in the context of "the nature and circumstances of the offense and the history and characteristics of the defendant...." 18 U.S.C. § 3553(a)(1).

In pre-*Booker* cases, where a district court made an upward departure notwithstanding the Guideline range, the appellate courts have found such an upward departure to be a powerful argument against remand. *United States v. Antonakopoulos*, 399 F.3d 68, 81 (1st Cir. 2005); *United States v. Bruce*, 396 F.3d 697, 720 (6th Cir. 2005) ("Surely, if the district court was not inclined to impose a shorter sentence despite its power to do so within the guideline's mandatory sentencing scheme, it would not have elected to reduce Defendant's sentence under a more open-ended advisory system"). In this case, the District Court

28

awarded a sentence (384 months) in excess of the minimum sentence (360 months). Consistent with *Antonakopoulos* and *Bruce*, such a sentence is a powerful argument against a reconsideration of this matter.

The sentence imposed by the District Court and its articulation of the reasons behind the sentence imposed were neither unreasonable nor inadequate. The record is emphatic that the District Court took pains to fashion a sentence that was just and appropriate. Davila's argument should be rejected.

## ARGUMENT EIGHT

Davila argues that the sentence of restitution was illegal because no investigation was made into Davila's ability to pay the amount imposed**.** The District Court sentenced Davila to pay restitution in the amount of $11,209.66. That figure, divided by his sentence of 384 months, works out to approximately $29.19 per month. When one adds the five-year supervised release to the time available for restitution, the figure falls to approximately $25.24 per month. Consistent with the recommendation of the U.S. Probation Office, no fine was imposed because of Davila's financial condition.

In other words, the Probation Office conducted a full investigation into Davila's financial condition and made recommendations to the District Court, which adopted those recommendations. Moreover, the 444 months of

29

incarceration and supervised release is sufficient time for Davila to make the extremely modest monthly payments previously calculated.

Davila cites the case of *United States v. Siegel*, 153 F.3d 1256 (11th Cir. 1998) in support of his claim. *Siegel* involved a defendant who was sentenced to pay restitution in the amount of $1,207,000 under the Mandatory Victims Restitution Act of 1996. *Siegel* at 1259. The Court of Appeals determined that the sentence had been imposed prior to the effective date of the Act and that, therefore, the case needed to be remanded for the district court for a determination of the defendant's ability to pay restitution. *Siegel* at 1258.

In the case at bar, however, the Probation Office undertook an investigation regarding Davila's ability to pay restitution and made recommendations that were adopted by the District Court. See Presentence Investigation Report at 12. Further, Davila's restitution, when spread out over the life of his incarceration and supervised release, is minimal. Davila's argument is without merit.

## ARGUMENT NINE

Davila's final argument is that his due process rights were violated because he had a hearing impediment that prevented him from understanding the plea and sentencing hearings. Again, his claim is demonstrably false. Both his attorney and the Drug Enforcement Administration agent who interviewed him concur that

he understood them perfectly.  Moreover, Davila acknowledged to the District

Court that he understood the proceedings against him and could hear the Court.

See Attachments A and D.

## **<u>CONCLUSION</u>**

For the aforestated reasons, the United States requests this Court to deny the

Petitioner's Motion and to permit his conviction and sentence to stand.

> Respectfully submitted,
>
> THOMAS A. MARINO
> United States Attorney
>
> /s/ Gordon A.D. Zubrod
> GORDON A.D. ZUBROD
> ASSISTANT U.S. ATTORNEY
> 228 Walnut Street
> Harrisburg, PA  17108
> Phone: (717) 221-4482
> Fax: (717) 221-2246
> Gordon.Zubrod@usdoj.gov
> PA20792

Dated: September 20, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 1:CR-01-018 |
| | ) | |
| v. | ) | |
| | ) | (Judge Rambo) |
| GEOVANI DAVILA, | ) | |
| | ) | |
| Defendant. | ) | (ELECTRONICALLY FILED) |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That this 20th day of September, 2005, she served a copy of the attached

## <u>BRIEF OF UNITED STATES IN OPPOSITION TO PETITIONER'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY</u>

via electronic filing and/or by placing said copy in a postpaid envelope addressed to the person(s) hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Harrisburg, Pennsylvania.

Dennis E. Boyle, Esquire
1525 Cedar Cliff Drive
Camp Hill, PA 17011


 /s/ Carol A. Manies_____
CAROL A. MANIES
Legal Assistant